# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 26, 2012 Session

# GARY CLARKE v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ACTING BY AND THROUGH THE ELECTRIC POWER BOARD AS NASHVILLE ELECTRIC SERVICE

**Appeal from the Chancery Court for Davidson County**
**No. 101521II     Carol L. McCoy, Chancellor**

---

**No. M2011-02607-COA-R3-CV - Filed December 18, 2012**

---

An employee of NES married a co-worker's daughter and was found by the NES civil service board to be in violation of the utility's nepotism policy that precluded related employees from working in the same "section." The employee sought judicial review, and the trial court reversed the administrative decision. We affirm the trial court's judgment because the administrative decision was arbitrary and capricious.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Waverly David Crenshaw, Jr., Bahar Azhdari, John E. B. Gerth, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County, acting by and through the Electric Power Board as Nashville Electric Service.

Christopher Dale Van Atta, Michelle Blaylock Owens, Nashville, Tennessee, for the appellee, Gary Clarke.

## OPINION

This case involves the application of a nepotism policy to an employee working for Nashville Electric Service ("NES"), a utility created by the Charter of the Metropolitan Government of Nashville and Davidson County.

# I. BACKGROUND

Mr. Clarke has been employed by NES since 1999. In 2007 he decided to marry the daughter of a co-worker, Kevin Snider. At that time, Mr. Clark worked as a cable splicer and Mr. Snider worked as a maintenance mechanic. NES had in place a nepotism policy that prevented relatives working in certain defined situations. NES employees were precluded from working under the supervision of a relative, and relatives were prohibited from working in the same section.

When Mr. Clarke decided to marry Mr. Snider's daughter, he did not believe his marriage would negatively affect his work for NES because (1) neither he nor Mr. Snider supervised the other and (2) he did not believe he and Mr. Snider worked in the same section. Mr. Clarke testified that someone in NES management informed him that he needed to obtain a waiver from the Board, referring to the Electric Employees' Civil Service and Pension Board, if he wanted to remain working in what NES at that time referred to as the Construction and Maintenance Section.

The Board declined to grant Mr. Clarke a waiver, but it gave him a six-month extension to find a suitable position at NES that would not violate the policy. When Mr. Clarke was unable to find another position with comparable pay, the Board granted him an additional 90 days to find another position. When he was still unable to find a suitable replacement position, NES threatened to terminate him if he did not move out of the Construction and Maintenance Section. Ultimately, Mr. Clarke accepted a position as a meter service technician, which is two pay grades below his former position of cable splicer.

Mr. Clarke then filed the following grievance with the Board:

On January 18, 2008, I was constructively demoted in order to avoid termination and accepted the position of field service technician pending the outcome of this grievance. NES Management feels that I am in violation of the nepotism policy however it is my position that I am not.

Pursuant to the grievance policy, an ALJ held an evidentiary hearing on June 11, 2009, during which Mr. Clarke was represented by the union. Based on the evidence presented at the hearing, the ALJ recommended that the Board dismiss Mr. Clarke's grievance and concluded:

. . . it has been proven that Grievant and Snider worked in the same section, a violation of the Nepotism Policy. Said violation was resolved once Grievant took a job outside the Construction and Maintenance Section.

-2-

The Board held a hearing on July 28, 2010, to consider the ALJ's Report and Recommendation. At the conclusion of the hearing, the Board voted to adopt the ALJ's Report and dismiss Mr. Clarke's grievance.

Mr. Clarke then filed a petition for review in the chancery court. After reviewing the evidence submitted at the hearing before the ALJ and the transcript of the hearing before the Board, the trial court issued a Memorandum and Order in which it concluded that the Board's deliberations were flawed. The trial court reversed the Board's decision[1]

NES appealed. The question before us is whether Mr. Clarke and Mr. Snider worked in the same "section," the term used in the nepotism policy.

## II. THE POLICY

The text of the nepotism policy was set forth in the Memorandum of Agreements between NES and the Nashville Electric Service Employees Association Chapter, Service Employees International Union Local 205 (the "union"), and was negotiated by NES and the union. Prior to 2002, the Nepotism Policy stated, in part, "No employee will be permitted to work under the direct or indirect supervision of a relative." The definition of relative included in-laws. There is no dispute that Mr. Clarke and Mr. Snider did not work under the direct or indirect supervision of each other.[2]

At the end of June, 2002, NES and the union negotiated an amendment to the Nepotism Policy and added some provisions, the following being the one at issue in this case:

> 2.     Any unsolicited attempt to influence the consideration of a relative employed at NES will result in disciplinary action, if appropriate, of the employee who attempts to interfere. Also, after July 1, 2002, **no two (2) relatives will be allowed to work in the same section.** Current

---

[1]The court remanded to the Board to determine the amount of back pay owed to Mr. Clarke and ordered that the backpay include compensation for overtime based on the average number of overtime hours worked by the employees in his former position. The trial court also ordered that NES "red-line" the salary in Mr. Clarke's current job so that he receives the same amount he would have been making, including overtime, had he not been required by NES to leave his prior position. We take no position on the authority of the trial court to do anything beyond affirming or reversing the administrative decision.

[2]The policy defines those terms, stating "A direct or indirect supervisory relationship exists when an individual occupying a supervisory position has a relative in a department which reports directly or indirectly to him/her; i.e. a supervisor is in the relative's chain of command."

situations will be grandfathered. (Emphasis added.)[3]

The question throughout these proceedings is whether Mr. Clarke and his father-in-law worked in the same "section," which was precluded by the policy.

### III. PROOF AT ALJ HEARING

There is no definition of the word "section" in the Nepotism Policy. The evidence shows that at all relevant times both Mr. Clarke and Mr. Snider worked in groups or units clustered under a larger, or umbrella, group designated Construction and Maintenance (or at times Underground and Substation ). Mr. Snider and Mr. Clarke did different kinds of work, had different supervisors, and never had a task requiring them to communicate with each other. At the hearing NES contended that this larger unit, Construction and Maintenance (sometimes C&M), was a "section," as that term is used in the Nepotism Policy. To avoid confusion, we will refer to this larger group as a unit.

At the time the Nepotism Policy was amended in 2002, Mr. Clarke worked as a cable splicer in the Field Support -- C&M Underground division of the Construction and Maintenance unit of NES. Mr. Snider worked as a maintenance mechanic in the Field Support -- C&M Support division of the Construction and Maintenance unit. Mr. Clarke worked in a different chain of command from Mr. Snider, and the individuals who supervised either Mr. Clarke or Mr. Snider did not supervise the other.

NES published numerous Tables of Organization ("TO") at different times between 1994 and 2008 showing the different chains of command in the Construction and Maintenance unit of NES. In February 2001 the TO with the heading "Underground and Substation" had the Operations Manager of Underground and Substation at the top of the chain of command. Cable splicers were in the direct chain of command of the "Field Superintendent Underground," and maintenance mechanics were under the direct chain of command of the "Field Superintendent Support."

The TO in the record from 2002, when the Nepotism Policy was amended to include the term "section," used the same labels and categories as the TO from 2001. The TO that was in effect at the time the Nepotism Policy was amended in 2002 is attached as Exhibit 1.

---

[3]Although different versions of the Nepotism Policy are included in the record for the years 2007 and 2008, the policy remained essentially the same, prohibiting relatives from working (1) in a supervisory relationship or (2) in the same section.

The TOs dated 2003, 2004, and 2005 continued to use the same labels to describe the manager of the Underground and Substation group and the heads of the groups where the cable splicers and maintenance mechanics worked. The term "section" did not appear anywhere on the TO's from these years.

Beginning in 2006 the TOs began to use the label "Construction and Maintenance Operations" in place of "Underground and Substation" at the top of the TO. The label for the superintendent in charge of cable splicers was changed from "Field Superintendent Underground" to "Field Superintendent – C&M Underground." The label for the superintendent in charge of maintenance mechanics remained unchanged. Again, the word "section" did not appear on the TO.

The first time the term "section" appeared on NES's TO was in 2007, just a few months before Mr. Clarke married Mr. Snider's daughter. A TO dated January or February 2007 had the heading "Construction and Maintenance Section" at the top of the page. The head manager was called the "Operations Manager," and the superintendent in charge of cable splicers was the "Field Superintendent – C&M Underground." The superintendent in charge of maintenance mechanics was referred to as the "Field Superintendent – C&M Support." The latest TO included in the record is dated October 7, 2008, and this TO retained the "Construction and Maintenance Section" label at the top of the page. The 2007 TO is attached as Exhibit 2.

Mr. Clarke presented witnesses who were employed at NES and who testified that they believed a section consisted of the crew who worked under a supervisor, such as the Underground Supervisor Network that was directly in charge of the cable splicers, or the Maintenance Shop Supervisor that was directly in charge of Maintenance Mechanics.

Mr. Clarke's witnesses included Ben Goolsby, who was employed by the union and was involved in negotiating the 2002 amendment to the Nepotism Policy that added the word "section." Mr. Goolsby testified that during the negotiations he understood the word "section" to mean the group of employees, or crew, working for a particular supervisor, such as the Underground supervisor. Referring to this TO, Mr. Goolsby testified that he believed the TO included fourteen different sections.

Mr. Goolsby testified that the individuals negotiating the policy amendment did not discuss the meaning of the word "section" because he believed his understanding matched everyone else's understanding. Mr. Goolsby was asked why he did not ask the management to define what a section was:

Q: Okay. All right. Now, if you are the gentleman signing on behalf of

-5-

the union in 2002 and it just says in this document, it says that no two relatives will be able to work in the same section, why didn't you get management to define what a section was in this document if you had - - your opinion was it dealt with - - a supervisor was a section? Why, if there was a difference, why didn't you have that outlined in this document?

A:    Because at that time I did not think there was a difference. I thought we were all on the same page, and that's exactly what we signed.

In addition to the testimony of Mr. Goolsby, Mr. Clarke offered the testimony of Joel Hallman, who was the vice president and president of the union in 2007 when Mr. Clarke married Mr. Snider's daughter. Mr. Hallman testified that he believed a section consisted of a field superintendent and the employees working under him or her. Mr. Hallman considered Construction and Maintenance to be a department made up of several sections, and "as long you didn't work under the same superintendent, you could work in any section that you could - - you could in that department." Mr. Hallman explained "that's the way we understood it."

Frank Spickler, who was the Field Superintendent – C&M Underground, testified that he considered the Underground Network Distribution, which included the employees working under him, to make up a section of Construction and Maintenance. Mr. Spickler explained that he always considered his work group to make up a section, and that it has been that way for as long as he could remember.[4] Mr. Spickler testified that as of 2002 NES referred to a supervisor's crew as his or her section.

Mr. Clarke also offered the testimony of an electrician working foreman, Ray Baldwin, who has worked for NES since 1974. Mr. Baldwin testified that Construction and Maintenance was a department made up of four smaller sections: Field Superintendent Underground, Field Superintendent Substation, Field Superintendent Support, and Planner/Coordinator. Mr. Baldwin testified that he did not know that management referred to Construction and Maintenance as a section until the ALJ hearing, and that he had never been given anything in writing indicating that what he had always known as a department was being changed to a section.

To support its argument that Mr. Clarke and Mr. Snider worked in the same section at the time Mr. Clarke married Mr. Snider's daughter, NES primarily relied on its TOs that

---

[4]Mr. Spickler also testified that he has heard at least one other superintendent in Construction and Maintenance refer to their work group as a section.

identified Construction & Maintenance as a section beginning in 2007.  *See* Exhibit 2.

Donald Ray Hill, II, who by the time of the ALJ hearing in 2009 was the operations manager of Construction & Maintenance, testified that the TO chart was typically kept by the manager and was not handed out to the other employees.  Mr. Hill also testified that NES annual reports may have referred to Construction and Maintenance as a section.  Other than annual reports and TOs, however, Mr. Hill could not recall any other document an employee would see that would indicate Construction and Maintenance was a "section" as opposed to a "department."  Mr. Hill acknowledged that most employees do not look at annual reports.

Following the hearing before her, the ALJ issued a Report of Findings of Fact and Recommendation (the "ALJ's Report") in which she wrote:

> NES introduced evidence at the ALJ hearing that showed it is clear that NES employees and personnel know what the sections and departments are at NES. At the ALJ hearing, NES introduced the Table of Organization ("TO") of February 9, 2007 . . . that was in effect at that time of this committee meeting. That TO clearly states "CONSTRUCTION AND MAINTENANCE SECTION" at the top of the page.  Additionally, all the TOs after this date . . . have the same wording across the top of each document. Grievant and his witnesses claim that each of the superintendents listed on the TOs . . . are in and of themselves sections.  However, the word "section" is never listed next to the superintendents' title in any of the accumulated documents . . . .

> In addition, NES showed, by Grievant's own testimony, that NES employees that work with Grievant think that Construction and Maintenance is a section. These employees knew that Grievant's upcoming marriage would place him in violation of the Nepotism Policy.  Grievant testified at the ALJ Hearing that "Human Resources called me.  First it started with me and him was in the – me and him – somebody – everybody was messing with me about it, and they said, 'Gary you-all can't be in the same section.'  And it was just shoptalk.  I don't know if you know what that is, about everybody was talking about it. . . ."

The ALJ concluded that Mr. Clarke and Mr. Snider were working in the same section, which was a violation of the Nepotism Policy.  She found that when Mr. Clarke took a job outside Construction and Maintenance the violation was resolved.  The ALJ recommended that Mr. Clarke's grievance be dismissed.

The Board held a hearing to consider the ALJ's Report and Recommendation.  The transcript of the hearing indicates that at least one of the Board members believed the term

"section" was defined in the Nepotism Policy.  At the conclusion of the hearing, the Board voted to adopt the ALJ Report and dismiss Mr. Clarke's grievance.

## IV. JUDICIAL REVIEW

The trial court reviewed the Board's decision using the standard of review set forth in the Tennessee Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-322.  After reviewing the evidence submitted at the hearing before the ALJ and the transcript of the hearing before the Board, the trial court set aside the Board's decision.  The trial court noted, *inter alia*, that when the current nepotism policy was negotiated, the term "section" was not used in the TO for Construction and Maintenance, which in 2002 was known as "Underground & Substation."  The trial court then wrote:

> The ALJ's decision that Construction and Maintenance was intended to be a "section" for purposes of the NES Nepotism Policy lacks an evidentiary foundation.  Thus, the Court looks to the policy itself for guidance.

> The logic behind NES's anti-nepotism policy is eviscerated when a large work area is arbitrarily designated as a "section" to prohibit two related employees from working in different subcategories of a department, when the employees do not interact with each other and their chains of command and supervision do not intersect.  The testimony and exhibits show that this was the case for Mr. Clarke and Mr. Snider. . . .

> What is left is the formalistic argument made by Donald Hill, who declared that because a vice president signed the TO in the space marked "Department Approval," the vice presidents were over "departments," the managers over "sections," the superintendents over "work groups" and the supervisors over "work crews."  Mr. Hill could not point to any NES hierarchical document which substantiated his description.  He did say, however, that the structure of NES changed in 1994, and that this change was reflected in NES's annual reports:

>> It was communicated in all the reports. Now, whether they soaked it in and understood, I doubt it because rank and file don't look at annual reports and things like that.  But it was communicated at the time that this is our structure.  The departments are what they were, and the sections are like Underground and Substation, C&M, they are sections.

The trial court concluded that Mr. Hill's explanation along with the other evidence submitted by NES did not rise to the level of substantial and material evidence:

> The expressed purpose of NES's anti-nepotism rule is to prevent favoritism in employment based upon family relationships. The record lacks competent evidence, direct or indirect, that such a scenario could arise between Mr. Clarke, in his original position, and Mr. Snider. Accordingly, the Court finds the ALJ's decision and the Board's decision to uphold it, is devoid of substantial and material evidence and results in an arbitrary and capricious decision.

The trial court reversed the Board's decision.

## V. THIS APPEAL

Judicial review of decisions by local government civil service boards that affect the employment of civil service employees is governed by the Uniform Administrative Procedures Act. Tenn. Code Ann. § 27-9-114(a)(1). Under that Act, a reviewing court may reverse or modify the administrative decision if the rights of a petitioner have been prejudiced because the administrative findings of fact, conclusions of law, or decisions are:

> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h). We apply the same standard of review on appeal. The two situations at issue here are subsections (4) and (5).

The "substantial and material" evidence standard requires a searching and careful inquiry into the record to determine the basis for the administrative decision. *Willamette Indus. v. Tennessee Assessment Appeals Comm'n*, 11 S.W.3d 142, 147 (Tenn. Ct. App. 1999)

(citing *Wayne Cnty. v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)). "Substantial and material evidence is 'such relevant evidence as a reasonable mind might accept to support a rational conclusion' and to furnish a reasonably sound basis for the decision under consideration." *City of Memphis v. Civil Service Comm'n of City of Memphis*, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007) (citing *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007) (further citations omitted)). We will reject an administrative decision if a reasonable person would necessarily arrive at a different conclusion based on the evidence. *City of Memphis*, 238 S.W.3d at 243 (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)).

Additionally, a reviewing court may reverse or modify an administrative decision if it is "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." A decision that is not supported by substantial and material evidence is necessarily arbitrary and capricious. *City of Memphis*, 238 S.W.3d at 243 (citing *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d at 315). Moreover, a decision is arbitrary or capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.*

## VI. ANALYSIS

The Nepotism Policy was part of an agreement that was negotiated between the union and NES. The term "section" is not defined either in the Nepotism Policy itself or elsewhere in the contracts included in the record where the policy is found. It is unclear what working unit that term was meant to describe.

The intent of the contracting parties when the contract is executed governs its interpretation. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). Mr. Goolsby, who repesented the union and was involved in the negotiations in 2002 when the Nepotism Policy was amended, testified that at the time of the agreement, he considered a section to be a work group, *i.e.*, "each supervisor's crews."

Herb DeBerry, who was Secretary of the Board in 2002 when the Nepotism Policy was amended and was involved in the negotiations along with Mr. Goolsby, testified that he did not remember any discussions during the negotiations about what a section was. Moreover, no other representative of NES testified about what they considered a section to be in 2002 when the Nepotism Policy was amended.

The TO in effect at the time of the 2002 amendment did not include the word "section" anywhere on it, and NES has not argued that Mr. Clarke and Mr. Snider worked

-10-

in the same section in 2002.[5]

The only places NES contends the term "section" appears in written form is on the TOs and in the annual reports. A manager acknowledged, however, that most employees and personnel do not see either TOs or annual reports. Other employees testified as to their understanding of "section," and that was consistent with the understanding of Mr. Goolsby and Mr. Clarke.

In several documents introduced at the ALJ hearing NES uses the term "section" and "department" indiscriminately and inconsistently. For example, Exhibit #23, which was introduced as a contact list, or directory, states: "The Construction & Maintenance Section is made up of four **sections**: Underground, Substation, Support, and Electrical Support. The following are contact numbers for each **section** as well as a description of what duties each section performs." (Emphasis added).

Even while imposing its definition of "section" on Mr. Clarke, the Board did not use that term to describe the larger work unit. Its minutes dated October 24, 2007, state: "After some discussion, the Board agreed to grant a six-month waiver from the date of the anticipated marriage to allow [Mr. Clarke or Mr. Snider] to move into a position in another **department**." Then, in a letter to Mr. Clarke, the Vice President of Human Resources instructed Mr. Clarke that he or Mr. Snider would have to obtain a position in "another **department.**" Finally, Justin Williams, who was formerly a Board member and was at one time Chairman of the Board, testified that he understood Mr. Clarke's dispute to be about whether Mr. Clarke worked in the same "division or department" as his father-in-law.

In view of these inconsistencies in the use of the term "section" by NES itself, the lack of a definition in the Nepotism Policy, and the evidence recounted here and earlier in this opinion, we must conclude that the Board's decision to require Mr. Clarke to leave his position as cable splicer was arbitrary and capricious.

Mr. Clarke was a cable splicer in 2002, and he was still a cable splicer in 2007, when he married Mr. Snider's daughter. Similarly, Mr. Snider was a maintenance mechanic in 2002, and he was still a maintenance mechanic in 2007. Each had a different line of authority and different supervisor(s) in 2002 and in 2007. The only change was that NES changed its operative TO and for the first time began calling the unit of NES where Mr. Clarke and Mr. Snider worked a "section," when that unit had not formerly been known as

_____

[5]NES presented evidence that the unit formerly known as "Underground and Substation" was renamed "Construction and Maintenance" in 2007. However, there was no evidence the unit was called a "section" until that word was added to the TO in January or February 2007.

such.

We therefore affirm the trial court's judgment reversing the Board's decision to adopt the ALJ's recommendation and dismiss Mr. Clarke's grievance,[6] and we remand the case to the trial court for whatever further proceedings may be necessary.

## VII. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment reversing the Board's decision to dismiss Mr. Clarke's grievance and remand the case to the trial court.

Costs are taxed against the Appellant, the Electric Employees' Civil Service and Pension Board of the Metropolitan Government of Nashville and Davidson County, Tennessee, for which execution shall issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[6]We reject NES's argument that the union's request on behalf of Mr. Clarke for a waiver under the Nepotism Policy means that Mr. Clarke believed he and Mr. Snider worked in the same section or that he was in violation of the policy after marrying Mr. Snider's daughter. In seeking a waiver, Mr. Clarke took the steps he was instructed to take by others at NES, and he testified consistently that he never believed he was in violation of the Nepotism Policy by marrying Mr. Snider's daughter.

**EXHIBIT 1**



## EXHIBIT 2



CONSTRUCTION AND MAINTENANCE SECTION